UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RELIANCE COMMUNICATIONS, LLC,<br><br>                             Plaintiff,<br><br>   -against-<br><br>CHUAN WANG, TELEEPOCH LIMITED LLC, UNI AMERICA LLC, and SONIM TECHNOLOGIES, INC.,<br><br>                        Defendants. | Case No. 2:24-cv-04433<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Reliance Communications, LLC ("Reliance" or "Plaintiff"), by its attorneys Nixon Peabody LLP, as and for its complaint against defendants Chuan Wang ("Wang"), Teleepoch Limited LLC ("Teleepoch"), Uni America LLC ("Uni"), and Sonim Technologies, Inc. ("Sonim", and together with Wang, Teleepoch, and Uni, the "Defendants"), alleges as follows:

**NATURE OF ACTION**

1.      The gravamen of this lawsuit involves an elaborate scheme by Chinese actors to steal trade secrets created by an American tech manufacturer. This case arises from Wang conspiring with Sonim, a publicly traded company, to steal trade secrets, intellectual property, and other confidential information from Reliance. The blatant copying of Reliance's products and stealing of its intellectual property that is alleged in this Complaint appear to have started shortly after Sonim received a significant equity investment from a group believed to be funded by Wang. Before this significant investment, Sonim was continuously losing tens of millions of dollars per year, and it was uncertain whether Sonim would be able to continue its operations. Upon information and belief, Wang invested in Sonim with a specific business model in mind to turn the company around in part by stealing Reliance's trade secrets and intellectual property.

2.      Reliance is an original equipment manufacturer ("OEM") and market leader in wireless communications products. In or around 2017, Reliance retained Teleepoch and Uni, companies controlled by Wang, to assist in the design, testing, and manufacturing of certain of Reliance's products in Teleepoch's facility in Shenzhen, China. Reliance would then sell these products to the major wireless carriers in the United States. These products were designed and tested specifically to meet the strict technical requirements and scheduling deadlines set by the wireless carriers. Upon information and belief, once Reliance had been given approval from wireless carriers that its products had met the carrier's strict requirements, Wang would disclose to Sonim trade secret information, intellectual property, and other confidential information belonging to Reliance that Wang acquired through Teleepoch's and Uni's work for Reliance, despite operating under a Non-Disclosure Agreement. Upon information and belief, Wang illegally disclosed this information to Sonim so that Sonim could quickly produce carrier compliant products without the expense and challenges of designing products that meet the carrier's strict technical specifications.

3.      In 2022, Reliance, through its brand name Orbic, released the Orbic Speed 5G Hotspot, a mobile 5G hotspot. At the time of its release, *PC Magazine* referred to it as the only device that could handle a specific carrier's new 5G network that operated at higher speeds with lower latency, and offered higher capacity. Reliance employees in Teleepoch's Shenzhen facility have seen a Sonim device being designed and tested that appears to be a direct copy of plaintiff's Orbic Speed 5G Hotspot. And, in 2023, Sonim submitted to the FCC for approval, a device that is nearly a carbon copy of plaintiff's Orbic Speed 5G Hotspot, including the same unique antenna placements, the same frequency bands, and the same integrated circuits that drive those frequencies.

4.      Additionally, in 2023, Reliance began developing a new technology that allows wireless communication products to operate with only one single millimeter wave antenna module while still meeting the technical specifications of the major wireless carriers. Since the industry standard is two single millimeter wave antennas, this new invention significantly reduced the manufacturing costs incurred in producing wireless communication products. Reliance's products incorporating this technology have not yet been released to the public, but Reliance employees in Teleepoch's Shenzhen facility have seen Teleepoch implementing and testing this technology in Sonim products.

5.      In short, Sonim was a failing wireless communications manufacturer that was losing millions of dollars each year and heading for extinction until it got a significant equity investment from a group believed to be funded by Wang, and shortly thereafter started developing products using trade secrets, intellectual property, and other confidential and proprietary information stolen from Reliance.

6.      Reliance seeks damages and equitable relief under relevant federal and state laws, including the Defense of Trade Secrets Act, 18, U.S.C. § 1831, et seq.

**THE PARTIES**

7.      Plaintiff Reliance Communications, LLC is a limited liability company organized under the laws of the State of New Jersey, which is registered to transact business in New York, and maintains its primary place of business in Hauppauge, New York.

8.      Upon information and belief, defendant Chuan Wang is a citizen of the United States and the Chairman and CEO of defendants Teleepoch and Uni. Upon information and belief, Wang received a bachelor's degree from Xi-an Jiaotong University, and a Ph.D. in electrical engineering from the University of Florida, and is sometimes referred to, and refers to himself as,

Dr. Wang.  Upon information and belief, Chuan Wang is also known as Dr. Charles Wang. Late last year, an executive at Teleepoch informed representatives of Reliance that Wang had recently been incarcerated at a Chinese prison for financial crimes.

9.      Upon information and belief, defendant Teleepoch Limited LLC is a limited liability company organized under the laws of the State of California, with its principal office located in Irvine, California. Upon information and belief, Teleepoch is a company controlled by Wang which he uses interchangeably with Uni to manufacture devices for Reliance.

10.     Upon information and belief, defendant Uni America LLC is a limited liability company organized under the laws of the State of California, with its principal office located in Tustin, California. Upon information and belief, Uni is a company controlled by Wang, which he uses interchangeably with Teleepoch to manufacture devices for Reliance.

11.     Upon information and belief, defendant Sonim Technologies, Inc. is a Delaware Corporation with its principal office located in San Diego, California. Sonim is a publicly traded company on the NASDAQ exchange. Sonim's largest shareholder is AJP Holding Company, LLC, which owns approximately 50% of Sonim shares and is controlled by the Wang family.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, including 18 U.S.C. § 1831 et seq., the Defense of Trade Secrets Act. The Court further has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Wang pursuant to Fed. R. Civ. P. 4(k) and New York Civil Procedure Laws and Rules 302 because Wang committed tortious acts outside of New York causing injury to Reliance in New York, regularly solicits business and derives

substantial revenue from goods used or consumed in New York, should reasonably expect his actions to have consequences in New York, and derives substantial revenue from interstate commerce.

14.     This Court has personal jurisdiction over Teleepoch pursuant to Fed. R. Civ. P. 4(k) and New York Civil Procedure Laws and Rules 301 and 302 because Teleepoch consented to the jurisdiction of the courts located in New York, and further because Teleepoch contracted with Reliance to supply goods from outside of New York into New York and committed tortious acts outside of New York causing injury to Reliance within New York, regularly transacts business and engages in other persistent courses of conduct in New York, derives substantial revenue from goods used or consumed in New York, and because Teleepoch derives substantial revenue from interstate commerce.

15.     This Court has personal jurisdiction over Uni pursuant to Fed. R. Civ. P. 4(k) and New York Civil Procedure Laws and Rules 301 and 302 because Uni consented to the jurisdiction of the courts located in New York, and further because Uni contracted with Reliance to supply goods from outside of New York into New York and committed tortious acts outside of New York causing injury to Reliance within New York, regularly transacts business and engages in other persistent courses of conduct in New York, derives substantial revenue from goods used or consumed in New York, and because Uni derives substantial revenue from interstate commerce.

16.     This Court has personal jurisdiction over Sonim pursuant to Fed. R. Civ. P. 4(k) and New York Civil Procedure Laws and Rules 302 because Sonim systematically and continuously transacts business in New York through, upon information and belief, the marketing and sale of products to New York customers, including, the New York Police Department and other first responder entities and organizations, and further because Sonim committed tortious acts outside

of New York causing injury to Reliance within New York, regularly transacts business and engages in other persistent courses of conduct in New York, derives substantial revenue from goods used or consumed in New York, and because Sonim derives substantial revenue from interstate commerce.

17.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(3) because defendant Teleepoch contractually consented to the jurisdiction of all courts located in New York.

## BACKGROUND

18.     Plaintiff Reliance Communications, LLC was organized in 2006 under the Laws of the State of New Jersey. In 2013, Reliance registered to transact business in New York as a foreign limited liability company.

19.     Reliance is a national distributor of innovative wireless devices and accessories. It has been a market leader in wireless communications products for more than two decades and works with the largest wireless carriers in the United States. As a one-stop service solution provider for the world's leading wireless carriers and device manufacturers, Reliance focuses on distribution, forward logistics, and reverse logistics. Reliance offers a full suite of modular services to its customers in support of their business needs. These services include engineering support, marketing support, product training, fulfillment, inventory management, repair, refurbishment, reclamation, and more.

20.     Reliance's wireless communication products, including its mobile phones and hotspots, are sold to the major national wireless carries in the United States, who then sell them to customers across the United States.

**A. Plaintiff's Relationship with Teleepoch.**

21.     On or about February 23, 2016, Reliance and Teleepoch executed a Mutual Non-Disclosure Agreement (the "NDA"). Wang, listed as a director of Teleepoch, executed the NDA on behalf of Teleepoch. Reliance relied upon this NDA in disclosing confidential, proprietary, and trade secret information to Teleepoch and its affiliated companies, including Uni.

22.     Pursuant to the NDA, "Confidential Information" included but was not limited to:

> [A]ll information shared by [Plaintiff] to [Teleepoch] related to any proprietary and confidential information belonging to any wireless carrier (i.e., Verizon Wireless, T-Mobile, Sprint, MetroPCS, etc.) ("Carrier") that includes Carrier requirement documentation, including, but not limited to, detailed technical information to Carrier network and interoperability specifications, technical or business information, installation or equipment standards and documentation, diagrams, data, know-how, formulas, algorithms, processes, design, statistics, schematics, plans, drawings, prototypes, strategies, and any other information exchanged between the Parties related to any financial matters, financial statements, banking or other financial information, business, commercial, trade-secret or technology related information, including but not limited to, information about the Disclosing Party's products, services or processes, any technical, financial, economic or commercial information and/or data, customer lists (potential or actual), other customer-related information, contact information, pricing lists, trade secrets, license agreements, company plans, product or supplier-related information, market intelligence and marketing and other business plans or strategies disclosed hereunder, and any other information regarding its operations, property, business or affairs. Confidential Information includes but is not limited to, information received form a third party, which the Disclosing Party is required to keep confidential. Confidential information also includes, but is not limited to, Confidential Information transmitted on any kind of media, including, but not limited to, electronic, written, magnetic, or orally.

23.     The NDA further provided that "Confidential Information will be kept confidential, will be used solely in connection with the evaluation of a potential business venture or opportunity between the parties hereto or their affiliates and, except as contemplated hereby, will not, without the prior written consent of the Disclosing Party be used or disclosed, directly or indirectly, in any manner whatsoever, in whole or in part at this time or any time in the future."

24.     In executing the NDA, Teleepoch agreed that "in the event of any breach or threatened breach of any provision of this Agreement, the Disclosing Party shall be without an adequate remedy at law and, accordingly, shall be entitled to enforce such provisions by temporary or permanent injunctive or mandatory relief obtained in an action or proceeding instituted in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other rights or remedies which it may have at law or in equity."

25.     Pursuant to the NDA, "each party agree[d] to transmit the Confidential Information only to those directors, officers, employees, agents, attorneys, advisors, affiliates or representatives (collectively, the "Representatives"), who, in its reasonable opinion, need to know the Confidential Information for the purpose of evaluating the potential business venture and who are informed of the confidential nature of the Confidential Information."

26.     On or about March 27, 2017, Reliance and Teleepoch entered into a term sheet for the production of a new wireless device (the "Term Sheet"), which formed the basis of their continued business relationship going forward.

27.     Pursuant to the Term Sheet, Teleepoch agreed that Reliance's products' industrial design, hardware design, software design, and features, are exclusive to Reliance. Teleepoch further agreed not to directly or indirectly disclose Reliance's information or details to any third party.

28.     Over the years, Teleepoch manufactured numerous wireless communication products for Reliance. Both parties used and relied upon the same design manufacturing framework set forth in the Term Sheet, as well as the NDA.

29.     First, Reliance would release to Teleepoch the specifications of the product it intended to have manufactured. This would include the carrier specific specifications and features.

Reliance and Teleepoch would then work together for approximately two weeks to generate a development schedule for the product.

30.     After approximately 10 weeks of development, the product would be sent to the Federal Communications Commission ("FCC") for approval, which could take another six weeks.

31.     After FCC approval was granted, the product would be tested for certification on the wireless carrier networks. After being certified for the specific wireless carrier networks, the product would then be ready to be delivered to the wireless carriers in the United States for retail sale nationwide.

32.     Reliance manufactured approximately 50 products with Teleepoch using this design manufacturing framework, and pursuant to the NDA.

33.     Reliance paid Teleepoch and Uni for these services by wiring payments in the hundreds of millions of dollars to various bank accounts owned by Teleepoch and Uni, and other entities controlled by Wang, some of which are located in California, including Teleepoch bank accounts at Bank of America and Cathay Bank; and Uni bank accounts at Bank of America and East West Bank.

**B. Reliance Releases the Orbic Speed 5G Hotspot.**

34.     In 2022, Reliance released the Orbic Speed 5G Hotspot, which quickly became the flagship hotspot for a major wireless carrier.

35.     Teleepoch began working on the Orbic Speed 5G Hotspot in mid-2021, and Reliance launched it in 2022. Leading up to the launch of the Orbic Speed 5G Hotspot, Reliance and Teleepoch had daily email communication concerning its design and testing.

36.     The Orbic Speed 5G Hotspot supported all 5G cellular bands, including C-band n77 and mWW, and could accommodate up to 30 Wi-Fi enabled devices at 5G speeds for up to 9 hours of continuous use.

37.    The Orbic Speed 5G Hotspot has a unique placement of its antenna that is built into the case of the hotspot:



38.    This unique antenna placement, along with the integrated circuits inside the Orbic Speed 5G Hotspot, enables the Orbic Speed 5G Hotspot to work with the following frequency bands:

| Product Name: | Orbic Speed 5G |
|---|---|
| EUT No.: | 1# |
| Hardware Version: | V1.2 |
| Software Version: | ORB500L5_v1.0.1.3_BVZRT |
| Tx Frequency: | WCDMA Band II: 1850 MHz ~ 1910 MHz |
| | WCDMA Band IV: 1710 MHz ~ 1755 MHz |
| | WCDMA Band V: 824 MHz ~ 849 MHz |
| | LTE Band 2: 1850 MHz ~ 1910 MHz |
| | LTE Band 4: 1710 MHz ~ 1755 MHz |
| | LTE Band 5: 824 MHz ~ 849 MHz |
| | LTE Band 12: 699 MHz ~ 716 MHz |
| | LTE Band 13: 777 MHz ~ 787 MHz |
| | LTE Band 48: 3550 MHz ~ 3700 MHz |
| | LTE Band 66: 1710 MHz ~ 1780 MHz |
| | 5G NR n2:1850 MHz ~ 1910 MHz |
| | 5G NR n5:824 MHz ~ 849 MHz |
| | 5G NR n66:1710 MHz ~ 1780 MHz |
| | 5G NR n77: 3300 MHz ~ 4200 MHz |
| | 5G NR n78: 3300 MHz ~ 3800 MHz |
| | 5G NR n260:37000 MHz ~ 29500 MHz |
| | 5G NR n261:27.5GHz ~ 28.35 GHz |
| | 802.11b/g/n: 2412 MHz ~ 2462 MHz |
| | 802.11a/ac/n/ax: 5180 MHz ~ 5240 MHz;5745 MHz ~ 5825 MHz |
| Rx Frequency: | WCDMA Band II: 1930 MHz ~ 1990 MHz |
| | WCDMA BandIV:2110 MHz ~ 2155 MHz |

| | WCDMA Band V: 869 MHz ~ 894 MHz |
|---|---|
| | LTE Band 2: 1930 MHz ~ 1990 MHz |
| | LTE Band 4: 2110 MHz ~ 2155 MHz |
| | LTE Band 5: 869 MHz ~ 894 MHz |
| | LTE Band 12: 729 MHz ~ 746 MHz |
| | LTE Band 13: 746 MHz ~ 756 MHz |
| | LTE Band 48: 3550 MHz ~ 3700 MHz |
| | LTE Band 66: 2110 MHz ~ 2180MHz |
| | 5G NR n2: 1930 MHz ~ 1990 MHz |
| | 5G NR n5: 869 MHz ~ 894 MHz |
| | 5G NR n66: 2110 MHz ~ 2180MHz |
| | 5G NR n77: 3300 MHz ~ 4200 MHz |
| | 5G NR n78: 3300 MHz ~ 3800 MHz |
| | 5G NR n260: 37000 MHz ~ 29500 MHz |
| | 5G NR n261:27.5GHz ~ 28.35 GHz |
| | 802.11b/g/n: 2412 MHz ~ 2462 MHz |
| | 802.11a/ac/n/ax: 5180 MHz ~ 5240 MHz;5745 MHz ~ 5825 MHz |

39.     At the time it was released, the Orbic Speed 5G Hotspot was the only hotspot on the market that was capable of working with the C-Band 5G frequency.

**C. Reliance Developed a High-Performance Single Millimeter Wave Signal Using A Single Antenna Module**

40.     Building upon the success of the Orbic Speed 5G Hotspot, beginning in 2023, Reliance began developing a high-performance millimeter wave signal using a single antenna module instead of the two antenna modules that had been the industry standard.

41.     Reliance's Chief Technology Officer ("CTO") invented this new technology, documented his findings, and tested it with simulations that established that this technology would work.  Reliance heavily guarded access to this critical invention.  In fact, while some high-level executives at Reliance were aware that the CTO was working on this technology, only the CTO was permitted to know how it worked.

42.     In or around November 2023, pursuant to the NDA between Reliance and Teleepoch, Reliance's CTO informed Teleepoch's chief engineer of Reliance's new single module millimeter wave technology so that it could be incorporated into new products that Teleepoch would design and test for Reliance, specifically the Orbic Trophy 5G Mobile Phone. Reliance was informed that only a limited number of Teleepoch employees—approximately 10—were permitted

access to Reliance's new technology, which was strictly necessary for their work. The Teleepoch employees were subject to the NDA.

43.     This new technology depended upon Reliance's trade secret information relating to the proprietary combination of angling and orientation of a single millimeter wave antenna and its programming. The current state of the art requires applying two antennas on two edges to enable coverage. Upon information and belief, only Reliance has been able to achieve coverage with a single antenna.

44.     At first, Teleepoch expressed that they did not believe that Reliance's new technology would work. Teleepoch in documented emails conveyed their inability to meet requirements with a single millimeter wave module. However, Reliance's CTO instructed Teleepoch, through extensive email communications and on-site instruction, on how to implement this new technology into Reliance's products. During daily exchanges with Teleepoch, Reliance conveyed design requirements and shared confidential material with Teleepoch to complete the design.

45.     As the mmWave technology part of the design intensified, Reliance ran simulations, continued refining the design, and instructed Teleepoch to change the design from November 2023 through February 2024. In February 2024, numerous design iterations yielded final performance numbers that met the major wireless carriers' requirements.

46.     Without Reliance's CTO guiding the design and implementation of the millimeter wave technology, including specifically the proprietary combination of angling and orientation of a single millimeter wave antenna and its programming, Teleepoch lacked the expertise and would not have been able to design or manufacture a hotspot with a single millimeter wave module that could satisfy the requirements of any wireless carrier.

47.     When one of the major wireless carriers requested a root cause analysis on Reliance's single millimeter wave antenna, a Teleepoch/Uni employee verified that the technology belongs to Orbic (Reliance's brand name); is for exclusive use in Orbic devices; and is based on a custom millimeter wave beam book and matching material permittivity and di-electric properties.

**D.  Sonim Technologies Was a Failing Business Until It Started Stealing Plaintiff's Trade Secrets, Intellectual Property, and Other Confidential and Proprietary Information.**

48.     Sonim was created in 1999 and became a public company in 2019. Sonim specialized in manufacturing "ultra rugged" mobile communication devices for use by first responders. Until they stole Reliance's technology, Sonim did not focus on selling consumer products.

49.     On February 14, 2019, Sonim submitted its Registration Statement to the Securities and Exchange Commission ("SEC"), describing itself as a "provider of ultra-rugged mobility solutions designed specifically for task workers physically engaged in their work environments, often in mission-critical roles." The Registration Statement explained that Sonim had two end markets: industrial enterprise and public sector. For "the industrial enterprise, [Sonim's] target markets included: (i) construction, (ii) energy and utility, (iii) facilities management, (iv) manufacturing and (v) transportation and logistics," while the public sector target markets included: "(i) public safety and (ii) federal government."

50.     The Registration statement noted that for the year ending December 31, 2017, Sonim had a net loss of $8.5 million.

51.     Sonim's financial outlook did not improve after its IPO. For the calendar year 2020, Sonim had a net loss of $29.9 million. Sonim's revenue declined by $9.4 million in calendar year 2021, which resulted in net loss of $38.6 million.

52.     As of December 31, 2021, Sonim was in dire financial condition. In an Annual

Report Form 10-K filed with the SEC on March 21, 2022, Sonim explained:

> We have incurred significant net losses since 2013 and have an
> accumulated deficit of $234.8 million as of December 31, 2021. In
> the year ended December 31, 2021, our liquidity has been further
> negatively impacted by a decline in the sales of our legacy products
> while our next generation products are still under development. In
> addition, legal expenses related to our ongoing SEC investigation
> during the year ended December 31, 2021 were high and may
> continue to impact our financial results in the foreseeable future. In
> addition, the terms and conditions of applicable bylaws, certificates
> or articles of incorporation, agreements or applicable law may
> obligate us under certain circumstances to indemnify our current and
> former directors, officers or employees, and underwriters, with
> respect to certain of our litigation matters, including the ongoing
> SEC investigation, and we have been advancing legal fees and costs
> to certain current and former directors, officers, employees and
> underwriters in connection with certain of the matters disclosed in
> "Note 11. Commitments and Contingencies". As a result of the
> foregoing, we will need to obtain additional financing to fund our
> operations. We cannot provide any assurance that we will be able to
> secure sufficient liquidity to fund our operations, including through
> additional capital from the sale of equity securities or financing, or
> that we will be able to achieve profitability through the roll-out of
> our next generation products or the cost efficiencies implemented in
> 2021 and 2020. If we are unable to generate or obtain the requisite
> amount of financing needed to fund our business operations, our
> liquidity and ability to continue operations could be materially
> adversely affected. As a result, we may be required to delay, reduce
> or cease our operations and we may be required to seek bankruptcy
> protection.

53.     Sonim further explained in its March 21, 2022 Form 10-K that it "has reduced its

global headcount from approximately 500 employees at year end 2019 to headcount of 102 of

which 77 are full time employees and 25 are contractors as of December 31, 2021," and that it had

"outsourced substantially all of its manufacturing functions, software development and quality

control functions to third parties, transferring the employees who previously performed this work."

**E.  Sonim Gets a Lifeline from Chuan Wang and AJP Holding Company LLC.**

54.     According to Sonim's SEC filings, "[i]n October 2021, Dr. Charles Wang and other members of the Wang family, including those who subsequently arranged the formation of [AJP Holding Company, LLC] and became its sole equityholders, informally approached Mr. Peter Liu, then the Executive Vice President for Global Operations and Engineering of Sonim, and inquired about the possibility of investing in or purchasing Sonim."

55.     Upon information and belief, Dr. Charles Wang is Chuan Wang.

56.     On February 9, 2022, representatives of AJP Holding Company, LLC ("AJP") presented Sonim with its intended business plan following the equity investment.

57.     In a meeting on March 25, 2022, representatives of AJP provided Sonim's management and Board, a business plan for Sonim, including "(i) the creation of a new product roadmap encompassing mobile carrier expansion proposals and pricing; (ii) entry into semi-rugged market; (iii) addressing the market need of 5G-capable devices; (iv) development of a performance-based KPI and incentives for employees and contractors with a focus on result-oriented growth of Sonim; (v) evaluation of the need for introduction of new key positions and roles in the marketing division; (vi) review and revision of the sales commission plan in order to optimize the volume growth incentive; and (vii) shift the focus of sales on mobile carriers as opposed to other distribution channels."

58.     On April 13, 2022, Sonim entered into a Subscription Agreement with AJP, pursuant to which AJP agreed to purchase from Sonim an aggregate of 20,833,333 shares of Sonim's common stock for a purchase price of $17,500,000.

59.     At some point, "Sonim ha[d] been made aware that, although the Wang family ha[d] funds sufficient to pay the first purchase price and the second purchase price, such funds [were]

not in a bank account controlled by [AJP]." AJP informed Sonim that it was in the process of establishing a bank account and intended to deposit the funds prior to the first closing.

60.     Upon information and belief, Wang's son—Jeffery Wang—received a seat on Sonim's board, and was appointed Sonim's Chairman, as a part of AJP's equity investment into Sonim.

**F. Teleepoch Steals the Orbic Speed 5G Hotspot for Sonim.**

61.     It was only after AJP's investment in Sonim that Teleepoch began designing and manufacturing products for Sonim. Upon information and belief, prior to the investment from the Wang family through AJP, Sonim used Foxconn for its design and manufacturing.

62.     Notably, after Sonim received the equity investment from AJP, it did not submit any new products for approval by the FCC for over a year. However, when Sonim finally submitted a product to the FCC for approval, it appeared to be a copy of the Orbic Speed 5G Hotspot.

63.     Reliance employees in Teleepoch's Shenzhen facility witnessed Teleepoch employees designing and testing Sonim's new hotspot that appeared to be an exact copy of the Orbic Speed 5G Hotspot.

64.     Upon hearing from employees that Teleepoch was stealing Reliance's trade secrets, intellectual property, and other confidential and proprietary information to develop hotspots for Sonim, in October 2023, the CEO of Reliance confronted Wang in person.

65.     Wang outright denied that Teleepoch was even working on a hotspot for Sonim.

66.     Despite Wang's denial, Reliance employees in Teleepoch's Shenzhen facility saw the Sonim hotspot being developed and tested by Teleepoch employees, and were able to take photographs of a Sonim hotspot on a Teleepoch employee's desk right next to Reliance's Orbic Trophy 5G Mobile Phones:



67.     Moreover, in a recent FCC filing, Sonim describes its "Mobile Hotspot" as being

capable of working on the same unique combination of frequency bands that the Orbic Speed 5G

Hotspot works on:

| Product Name: | Mobile Hotspot |
|---|---|
| EUT No.: | 22#, 33#, 34# |
| Hardware Version: | V1.0 |
| Software Version: | H50.0-01-5.4.0-15.08.00 |
| Tx Frequency: | WCDMA Band II: 1850 MHz ~ 1910 MHz |
| | WCDMA Band IV: 1710 MHz ~ 1755 MHz |
| | WCDMA Band V: 824 MHz ~ 849 MHz |
| | LTE Band 2: 1850 MHz ~ 1910 MHz |
| | LTE Band 4: 1710 MHz ~ 1755 MHz |
| | LTE Band 5: 824 MHz ~ 849 MHz |
| | LTE Band 7: 2500 MHz ~ 2570 MHz |
| | LTE Band 12: 699 MHz ~ 716 MHz |
| | LTE Band 13: 777 MHz ~ 787 MHz |
| | LTE Band 17: 704 MHz ~ 716 MHz |
| | LTE Band 48: 3550 MHz ~ 3700 MHz |
| | LTE Band 66: 1710 MHz ~ 1780 MHz |
| | 5G NR n2: 1850 MHz ~ 1910 MHz |
| | 5G NR n5: 824 MHz ~ 849 MHz |
| | 5G NR n48: 3550 MHz ~ 3700 MHz |
| | 5G NR n66: 1710 MHz ~ 1780 MHz |
| | 5G NR n77: 3300 MHz ~ 4200 MHz |
| | 5G NR n78: 3300 MHz ~ 3800 MHz |
| | 5G NR n260: 37000 MHz ~ 40000 MHz |
| | 5G NR n261: 27500 MHz ~ 28350 MHz |
| | 802.11b/g/n/ax: 2412 MHz ~ 2472 MHz |
| | 802.11a/ac/n/ax: 5180 MHz ~ 5240 MHz; 5745 MHz ~ 5825 MHz |

68.     Additionally, as witnessed by Reliance employees in Teleepoch's Shenzhen facility, the Sonim hotspot utilizes the identical unique antenna placement used in the Orbic Speed 5G Hotspot:

 

69.     The above photographs show Sonim using Laser Direct Structuring ("LDS") to place the antenna in its hotspot. This is a process whereby an antenna can be designed and produced onto a 3-dimensional plastic carrier. This antenna carrier can be a separate plastic entity or an existing integral part of the product's housing. This design was perfected on the Orbic Speed 5G Hotspot and was stolen for use in Sonim's hotspot. Elements of technology that were replicated include meta-material structures, radio frequency ("RF") isolation, adjacent channel interference avoidance, and carrier specific equivalent isotropic radiated power ("EIRP") and effective isotropic sensitivity ("EIS"), and spherical coverage.

**G. Sonim Tests a New Hotspot Produced by Teleepoch That Utilizes the Single Millimeter Wave Antenna Technology Developed by Reliance.**

70.     A Reliance employee witnessed Teleepoch employees working on the Sonim replica of the Orbic Speed 5G Hotspot, with instructions to build it with a single millimeter wave antenna module—the exact trade secret that Reliance had recently developed and shared with Teleepoch under the NDA.

71.     The instructions given to the Teleepoch employee was to start with Sonim's version of the Orbic Speed 5G Hotspot and turn off one of the two antenna modules using software, but without removing the antenna module. If the product could still pass a test, then Sonim would begin configuring the product with a single antenna module.

72.     Upon information and belief, Sonim first began replicating the Orbic Speed 5G Hotspot, which had two millimeter wave antenna modules. Upon information and belief, as Teleepoch learned from Reliance how to meet carrier performance requirements with a single millimeter wave module through the Orbic Trophy 5G Mobile Phone project, Teleepoch began introducing Reliance's single millimeter wave module technology into Sonim's devices.

**H.  Sonim Announces Its 5G Hotspot.**

73.     On Tuesday, June 18, 2024, Sonim announced in a press release that the "Sonim H500 5G mobile hotspot series [will be] available through select carriers in North America beginning summer 2024."

74.     Notably, the FCC filing for the Sonim hotspot with the model name "H500V" indicates that it contains a single millimeter wave module.

75.     Upon information and belief, the Sonim H500 hotspot contains Reliance's proprietary combination of angling and orientation of a single millimeter wave antenna and programming that was misappropriated by Wang, Teleepoch, Uni, and Sonim.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**(Violation of DTSA, 18 U.S.C. § 1831 et seq. – Against All Defendants)**

76.     Plaintiff repeats and realleges the foregoing paragraphs 1 to 75 with the same force and effect as if set forth here fully and at length.

77.     Plaintiff's technical designs, know-how, and inventions, which Plaintiff provided to defendant Teleepoch pursuant to an NDA, constitute trade secrets within the meaning of the

19

DTSA, because it is financial, business, scientific, technical and/or engineering information, including the proprietary combination of angling and orientation of a single millimeter wave antenna and its programming, other patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and/or codes that Plaintiff has taken reasonable measures to keep secret and that derives independent economic value from not being generally known and not being readily available through proper means.

78.     Upon information and belief, Defendants have misappropriated Plaintiff's trade secrets. Defendants Wang, Teleepoch, and Uni misappropriated Plaintiff's trade secrets by disclosing them without the express or implied consent of Plaintiff, and in violation of the NDA. Defendant Sonim misappropriated Plaintiff's trade secrets because at the time that it used Plaintiff's trade secrets, it knew or had reason to know that the trade secrets were acquired by Wang, Teleepoch, and/or Uni under circumstances giving rise to a duty to maintain secrecy of the trade secret or limit the use of the trade secret.

79.     Upon information and belief, defendant Sonim knew or had reason to know that it was illegally using Plaintiff's trade secrets because it had not derived this information itself.

80.     By virtue of the foregoing, Defendants used improper means to acquire and use Plaintiff's trade secret information, or at the time of the disclosure had reason to know that the information was acquired or disclosed through improper means, under circumstances giving rise to a duty to maintain secrecy of the trade secrets.

81.     Plaintiff never consented to the disclosure or use of its trade secrets by Defendants.

82.     Any use of Plaintiff's trade secrets by Defendants, and any disclosure of Plaintiff's trade secrets by Wang, Teleepoch, and/or Uni, is an unconsented disclosure and use, with neither express nor implied consent.

83.     By reason of the foregoing, Plaintiff has suffered, is suffering, and stands to suffer damages in an amount to be proven at trial, including by the loss of sales of the Orbic Speed 5G Hotspot and other products to wireless carriers in New York and elsewhere in the United States.

84.     Plaintiff is entitled to injunctive relief enjoining and restraining Defendants from further using, disclosing or exploiting Plaintiff's trade secrets at issue herein.

85.     By reason of the foregoing, Defendants have been unjustly enriched in an amount that may not be addressed through the computation of damages for actual loss.

86.     Defendants misappropriated Plaintiff's trade secrets willfully and maliciously within the meaning of the DTSA, and therefore Plaintiff is entitled to recover exemplary damages equal to two times the amount of damages awarded under the DTSA.

### AS AND FOR A SECOND CLAIM FOR RELIEF
### (Common Law Misappropriation of Trade Secrets – Against All Defendants)

87.     Plaintiff repeats and realleges the foregoing paragraphs 1 to 86 with the same force and effect as if set forth here fully and at length.

88.     Plaintiff's technical designs, know-how, and inventions, which Plaintiff provided to defendant Teleepoch pursuant to an NDA, constitute trade secrets under New York law, in that this information gives Plaintiff an opportunity to obtain and have an advantage over competitors who do not know or use it.

89.      Upon information and belief, Defendants have misappropriated Plaintiff's trade secrets. Defendants Wang, Teleepoch, and Uni misappropriated Plaintiff's trade secrets by disclosing them without the express or implied consent of Plaintiff, and in violation of the NDA. Defendant Sonim misappropriated Plaintiff's trade secrets because at the time that it used Plaintiff's trade secrets, it knew or had reason to know that the trade secrets were acquired by

Wang, Teleepoch, and/or Uni under circumstances giving rise to a duty to maintain secrecy of the trade secret or limit the use of the trade secret.

90.     By reason of the foregoing, Plaintiff has suffered, is suffering, and stands to suffer damages in an amount to be proven at trial, including by the loss of sales of the Orbic Speed 5G Hotspot and other products to wireless carriers in New York and elsewhere in the United States.

91.     Plaintiff is entitled to injunctive relief enjoining and restraining Defendants from further using, disclosing, or exploiting Plaintiff's trade secrets at issue herein.

92.     Plaintiff has no adequate remedy at law.

### AS AND FOR A THIRD CLAIM FOR RELIEF
### (Unfair Competition – Against All Defendants)

93.     Plaintiff repeats and realleges the foregoing paragraphs 1 to 92 with the same force and effect as if set forth here fully and at length.

94.     Upon information and belief, Defendants have misappropriated the fruit of Plaintiff's labors and expenditures by obtaining access to Plaintiff's proprietary information, including trade secrets, through an abuse of a confidential relationship in order to unfairly compete against Plaintiff in the wireless device market.

95.     As a proximate result of Defendants' unfair competitive acts complained of herein, Plaintiff has suffered or stands to suffer competitive injury in the form of direct financial loss, lost dealings, and lost profits.

96.     Plaintiff has been damaged in an amount to be proven at trial.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Breach of Contract – Against Teleepoch)

97.     Plaintiff repeats and realleges the foregoing paragraphs 1 to 96 with the same force and effect as if set forth here fully and at length.

98.     The NDA is a binding agreement between defendant Teleepoch and Plaintiff.

99.     Defendant Teleepoch breached the NDA when it disclosed to defendants Sonim, Wang, Uni, and potentially others, Plaintiff's trade secrets and confidential information, including Plaintiff's technical and/or business information, installation or equipment standards and documentation, diagrams, data, know-how, formulas, algorithms, processes, design, statistics, schematics, plans, drawings, prototypes, strategies, business, commercial, trade-secret or technology related information.

100.    Defendant Teleepoch's disclosure of Plaintiff's Confidential Information is a breach of the NDA because it was not in furtherance of any business venture between Teleepoch and Reliance, but was for the intended purpose of stealing Plaintiff's Confidential Information.

101.    As a proximate result of Teleepoch's breach of the NDA, Plaintiff has been damaged in an amount to be proven at trial.

**AS AND FOR A FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment – Against All Defendants)**

102.    Plaintiff repeats and realleges the foregoing paragraphs 1 to 101 with the same force and effect as if set forth here fully and at length.

103.    Defendants have been unjustly enriched by exploiting the fruit of Plaintiff's labors and expenditures to develop products for Sonim.

104.    Defendants' unjust enrichment has been at Plaintiff's expense.

105.    It is against equity and good conscience to permit Defendants to retain the benefit they have obtained at Plaintiff's expense, and to keep what has been taken unjustly from Plaintiff, without fair compensation paid to and recovered by Plaintiff.

106.    As a proximate result of the foregoing, Plaintiff is entitled to an award of damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants awarding to Plaintiff:

a.  Damages in an amount to be proven at trial;

b.  Exemplary damages in an amount of two times the amount of damages awarded under the DTSA, pursuant to 18 U.S.C. 1836(b)(3)(C);

c.  Injunctive relief enjoining and restraining Defendants, their agents, employees, and all persons acting in concert therewith from manufacturing, designing, and selling products containing or made in reliance upon Plaintiff's confidential and proprietary information, intellectual property, and/or trade secrets;

d.  Reasonable attorney fees pursuant to 18 U.S.C. 1836(b)(3)(D); and

e.  Such other and further relief as the Court deems just, equitable, and fair, including the costs and expenses of this case.

Dated: Melville, New York
       June 21, 2024

                                        **NIXON PEABODY LLP**

                                        By: _____
                                                Timothy D. Sini
                                                Neil P. Diskin
                                        275 Broadhollow Road
                                        Melville, New York 11747
                                        (516) 832-7500
                                        tsini@nixonpeabody.com
                                        ndiskin@nixonpeabody.com

                                        On Lu (*pro hac vice* application forthcoming)
                                        NIXON PEABODY LLP
                                        1 Embarcadero Center, 32nd Floor
                                        San Francisco, California 94111
                                        (415) 984-8200
                                        onlu@nixonpeabody.com

24